1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11   RICHARD L. McCARTOR, Sr., LINDA
      McCARTOR-AMMONS, as Administrators
12   of the Estate of RICHARD L. McCARTOR,      No.  C05-0032Z
      JR., TALISHA BROCKMAN, minor child
13   of RICHARD McCARTOR, JR.,                    ORDER

14                            Plaintiffs,

15   v.

16   The CITY OF KENT, a municipal
      Corporation; Kent Police Officers KEVIN
17   EADES, DAVID BUCK, JOSEPH
      GAGNER,

18                            Defendants.

19

20        This case comes before the Court on Defendants' Motion for Summary Judgment

21   Dismissal of Eades, Buck and Gagner Based on Qualified Immunity, docket no. 18.[1]  Having

22   considered the briefs in support of and in opposition to the motion, and the oral argument of

23

24

25   _____

26        [1] Defendants' motion does not move for the dismissal of the defendant City of Kent.  This
      Order uses the term "Defendants" only to refer to the individual defendants: Eades, Gagner and
      Buck.

      ORDER   1–

1  counsel on September 13, 2005, the Court now grants the motion and enters the following
2  Order.

3  ## BACKGROUND

4       On December 6, 2002, Officer Kevin Eades of the Kent Police Department observed
5  Richard L. McCartor, Jr. ("Mr. McCartor") driving a Suzuki Samurai approximately 48 miles
6  per hour in a 30 mile-per-hour zone.  Ragonesi Decl., docket no. 17, Ex. 1 at 4 (Eades Test.
7  at 18:4-16).  Officer Eades paced Mr. McCartor and told dispatch that he was going to stop
8  the car for a traffic violation.  Id. at 4 (Eades Test. at 18:17-24).  Mr. McCartor turned right
9  onto 101st Ave SE.  Id. at 4 (Eades Test. at 18:20-21).  At this point, Officer Eades activated
10 his emergency lights to try to stop him.  Id. at 5 (Eades Test. at 20:8-11).  Mr. McCartor
11 ignored Officer Eades and continued driving.  Id. at 5 (Eades Test. at 20:10-15).  Officer
12 Eades then honked his horn a couple of times to try to get Mr. McCartor's attention.  Id.
13 Officer Eades checked Mr. McCartor's license plate on the Department of Licensing
14 computer in his patrol car and learned that Mr. McCartor owned the Samurai and had a
15 suspended driver's license.  Id. at 12 (Eades Test. at 42:5-17).  Having a suspended driver's
16 license would have been an additional reason for the police to pull over the car.  Id. at 12
17 (Eades Test. at 42:18-24).  However, there is no evidence that Officer Eades identified the
18 driver as Mr. McCartor.

19      Mr. McCartor made a turn into a parking lot, and Officer Eades believed he was going
20 to stop.  Id. at 5-6 (Eades Test. at 20:20-21:1).  However, Mr. McCartor did not stop;
21 instead, Mr. McCartor turned around in the lot and drove back out onto the street.  Id. at 6
22 (Eades Test. at 21:2-6).  Officer Eades activated his siren several times and continued to
23 follow Mr. McCartor down the street.  Id. at 6 (Eades Test. at 21:8-9).  At this point, Officer
24 Eades estimates that Mr. McCartor was driving between 10 and 20 miles per hour.  Id. at 6
25 (Eades Test. at 21:21-24).  Mr. McCartor then entered a McDonald's parking lot and kept
26 driving, even though the patrol car's lights and sirens were activated.  Id. at 7 (Eades Test. at

ORDER  2–

22:5-9, 22:16-19).  Officer Eades testifies that Mr. McCartor "wasn't going fast at all" in the McDonald's parking lot and estimates that Mr. McCartor was driving between 10 and 15 miles per hour.  Id. at 7 (Eades Test. at 22:12-15).

Officer Eades attempted a Pursuit Intervention Technique ("PIT") maneuver to try and stop Mr. McCartor's car and prevent him from exiting the McDonald's parking lot.  Id. at 7-8 (Eades Test. at 22:21-23:11).  According to Officer Eades, a PIT is a maneuver in which a police officer displaces a car by bumping its back end and spinning it around to stall it and bring it to a stop.  Id.  Officer Eades pulled up to the left side of the rear quarter of Mr. McCartor's Samurai and struck it with his car, spinning the Samurai 180 degrees.  Id. at 8 (Eades Test. at 23:12-25).  Officer Eades' PIT maneuver failed to bring Mr. McCartor's car to a complete stop; when Mr. McCartor continued to drive after the PIT maneuver, Mr. McCartor drove by Officer Eades' patrol car in the opposite direction.  Id. at 9 (Eades Test. at 24:1-24:13).  Officer Eades had to make a U-turn to catch up with Mr. McCartor.  Id. (Eades Test. at 24:14-18).

At some point before the PIT maneuver, Officer David Buck, another Kent police officer, arrived at the McDonald's parking lot.  Id. at 17 (Buck Test. at 74:4-13).  Officer Buck witnessed Officer Eades perform the PIT maneuver.  Id.  According to Officer Buck, Mr. McCartor's Samurai did not come to a complete stop, but was rolling slowly backwards. Id. at 17 (Buck Test. at 74:12-22).  Officer Buck believed that the Samurai was going to stop, and he exited his patrol car and approached the driver's side of the Samurai.  Id. at 17-18 (Buck Test. at 74:23-75:7).  Mr. McCartor's driver's side window was down, and Mr. McCartor looked out the window and yelled at Officer Buck about the damage to his car.  Id. at 19 (Buck Test. at 76:1-5); Cross Decl., docket no. 21, Ex. 8 (Buck Stat. at 4-5).  Officer Buck told Mr. McCartor to get out of the car.  Ragonesi Decl., docket no. 17, Ex. 1 at 19 (Buck Test. at 76:6-10).  Mr. McCartor did not exit his car.  Id.  Police sirens were still going at this point.  Id. at 19 (Buck Test. at 76:16-17).

ORDER   3–

Officer Buck approached the car and reached in and grabbed Mr. McCartor's hands, which were on the steering wheel. Id. at 19 (Buck Test. at 76:19-21). Officer Buck pushed Mr. McCartor back into the seat with his right hand. Id. Officer Buck intended to get ahold of one of Mr. McCartor's hands, pull it out the window, and use a pain compliance technique to gain control of Mr. McCartor. Id. at 19-20 (Buck Test. at 76:22-77:10). Officer Buck tried to steer the Samurai to the right, where he believed it would be safer, but realized that Mr. McCartor could steer the car to the left, as he had both hands on the steering wheel and thus more force. Id. at 21-22 (Buck Test. at 78:1-13, 78:23-79:3). Officer Buck then reached into the car further, trying to hit the gear shift out of gear because he realized that the car was moving. Id. at 22 (Buck Test. at 79:3-7). Officer Buck tried to swat the gear shift, but saw Mr. McCartor reach down, grab the gear shift, and step on the gas. Id. at 22 (Buck Test. at 79:13-21).

Mr. McCartor then began to turn the car north, and he stepped on the gas such that the Samurai immediately sped up. Id. at 23 (Buck Test. at 80:12-20). Officer Buck was in the car a little bit further than his right elbow, his left hand was still on the steering wheel, and his head was inside the car. Id. at 23-24 (Buck Test. at 80:21-81:2). Once Mr. McCartor stepped on the gas, Officer Buck had to quickly side-shuffle to keep up. Id. at 24 (Buck Test. at 81:8-12). The Samurai continued to accelerate, and Officer Buck realized that he had to get out of the car because it wasn't going to be safe to stay there. Id. at 24 (Buck Test. at 81:14-18). Officer Buck was concerned that he was going to be pinched between the Samurai and the vehicles in the parking lot. Id. at 28 (Buck Test. at 110:10-19). The car was heading towards the McDonald's drive-thru. Id. at 26 (Buck Test. at 83:3-7). Officer Buck made an attempt to sweep his right hand onto Mr. McCartor's face in order to make Mr. McCartor stop the car. Id. at 24 (Buck Test. at 81:18-25). Officer Buck's right hand slid down onto Mr. McCartor's left shoulder, and that gave him an opportunity to break Mr. McCartor's left hand free of the steering wheel and pull Mr. McCartor's left arm out of the

ORDER   4–

1  window.  Id. at 25 (Buck Test. at 82:1-6).  Just as Officer Buck became free of the Samurai

2  and began to rotate Mr. McCartor's left hand into a counter joint technique, he heard shots

3  fired and the car rolled to a stop.  Id. at 25 (Buck Test. at 82:11-17).

4       During the course of the incident, Officer Eades twice called out on the dispatch radio

5  – first to say that Mr. McCartor was failing to yield, and later to say that Mr. McCartor's car

6  was dragging Officer Buck.  Id. at 15-16 (Eades Test. at 48:21-49:3).

7       Officer Joseph Gagner, another Kent Police Officer who had also arrived on the

8  scene, witnessed the Samurai spinning after the PIT maneuver.  Id. at 32-33 (Gagner Test. at

9  127:17-128:1).  Officer Gagner got out of his car, taking his rifle with him.  Id. at 33 (Gagner

10  Test. at 128:10-15).  The Samurai was moving, and Officer Buck's arms were inside the

11  driver's window.  Id. at 34-35 (Gagner Test. at 129:9-11, 129:20-130:11).  At first, Officer

12  Buck was able to keep up with the Samurai at a fast pace.  Id. (Gagner Test. at 130:19-22)

13  ("[H]e wasn't running . . . wasn't walking . . . [i]t was just kind of like trotting.").  But then

14  the Samurai accelerated, and Officer Gagner focused his attention on Officer Buck's feet as

15  Officer Buck was running alongside the car.  Id. at 36-37 (Gagner Test. at 131:13-20,

16  132:12-14).  Officer Buck had to run faster and faster to keep up with the car.  Id. at 37

17  (Gagner Test. at 132:14-18).  Officer Gagner became concerned that Officer Buck would not

18  be able to keep up with the Samurai due to its accelerated speed.  Id. at 38 (Gagner Test.

19  133:11-19).

20       Out of his peripheral vision, Officer Gagner noticed that a patrol car was driving to

21  the parking lot's exit to prevent the Samurai from leaving the lot.  Id. at 37-38 (Gagner Test.

22  at 132:18-133:10).  Around this time, Dana Robert Harrison, a school security officer in

23  another vehicle, pulled into the parking lot to try to block Mr. McCartor from leaving.  Id. at

24  51 (Harrison Test. at 22:15-23:12).  Officer Gagner then saw the Samurai swerve towards the

25  McDonald's, and Officer Gagner "had a vision" of Officer Buck being smashed into the side

26  of one of two posts located near a fence by the McDonald's.  Id. at 39 (Gagner Test. at

1   134:12-22).  Officer Gagner had "no doubt" that the Samurai could possibly collide with the

2   fence or the posts.  Id. at 40 (Gagner Test. at 135:6-20).  At this point, Officer Gagner was

3   standing close behind Mr. McCartor's car and "directly behind the driver."  Cross Decl.,

4   docket no. 21, Ex. 22 (Gagner Stat. at 7).  He then raised his rifle and fired twice, killing Mr.

5   McCartor.  Ragonesi Decl., docket no. 17, Ex. 1 at 40 (Gagner Test. at 135:21-23).  After

6   Officer Gagner fired the two shots, Mr. McCartor's car came to an immediate stop.  Id. at 42

7   (Gagner Test. at 137:9-10).

8          The above account of the facts is that of Defendants.  The deceased, Mr. McCartor –

9   the witness most likely to contradict the testimony of the officers – is unable to provide his

10  version of the facts.  The Court makes every effort to ensure that the officers are not taking

11  advantage of this fact by carefully examining the testimony of other eyewitnesses to the

12  incident.  Civilian witness accounts of the incident generally corroborate the officers'

13  testimony.  Some of the key facts provided by the individual officers that are undisputed are:

14  (1) Mr. McCartor kept driving his car after the PIT maneuver; (2) Officer Buck reached into

15  the slowly moving car; (3) Officer Buck told Mr. McCartor to exit the car, and Mr. McCartor

16  did not obey this command; (4) the car accelerated while Officer Buck's upper body was

17  inside Mr. McCartor's moving car; (5) Officer Buck and Mr. McCartor struggled to have

18  control of the car while the car was moving; (6) Officer Buck regained his footing and was

19  able to pull Mr. McCartor's left arm out of the window in an attempt to perform a pain

20  compliance technique; (7) within moments before or after Officer Buck pulled Mr.

21  McCartor's left arm out of the window, Officer Gagner fired two shots in a row, killing Mr.

22  McCartor; and (8) after Officer Gagner fired the two shots, Mr. McCartor's car came to an

23  immediate stop.

24         As Plaintiffs point out, it is undisputed that the police provided no warning to Mr.

25  McCartor that deadly force would be used on him if he did not stop.  None of the individual

26  defendants have claimed that Officer Gagner gave any such warning, and witnesses reported

that they did not hear any shouting, yelling or verbal commands prior to the shooting.  See

Cross Decl., docket no. 21, Ex. 14 (Quinonuz Stat. at 7); id., Ex. 15 (Scott Stat. at 6); id., Ex.

20 (McBride Stat. at 4).  It is also undisputed that there were no pedestrians or moving

vehicles in the McDonald's parking lot endangered by Mr. McCartor's car.  See id., Ex. 6

(Valdlvinos Stat. at 6); id., Ex. 8 (Harrison Stat. at 5); id., Ex. 9 (Black Stat. at 5); id., Ex. 10

(Thiele Stat. at 7); id., Ex. 11 (Boyer Stat. at 6); Ragonesi Decl., docket no. 17, Ex. 1 at 21

(Buck Test. 78:14-16).

Disputes exist regarding several facts.  First, on the issue of the speed of Mr.

McCartor's car in the McDonald's parking lot, Plaintiffs have provided evidence that the car

was moving slowly, perhaps never exceeding five miles per hour.  See Cross Decl., docket

no. 21, Ex. 12 (Satar Stat. at 1) ("no more than five miles per hour"); id., Ex. 9 (Black Stat.

at 3) ("slow enough to walk along side"); id., Ex. 10 (Thiele Stat. at 7) ("slow . . . but I don't

. . . remember it totally stopped"); id., Ex. 14 (Quinonuz Stat. at 5) ("moving very slow, but

he was moving."); id., Ex. 5 (Eck Stat. at 8) ("the vehicle was not by any means speeding out

of there.").

Second, on the issue of Officer Buck's safety, Plaintiffs have provided evidence,

including Officer Buck's own testimony, that Officer Buck was able to keep up with the car

and that he was not being dragged at any point in time.  See Ragonesi Decl., docket no. 17,

Ex. 1 at 28 (Buck Test. 110: 10-19) (discussing whether he was frightened that he "might" be

dragged if the vehicle continued to accelerate moments before the shots were fired, implying

that he was not being dragged); see id. at 38-40 (Gagner Test. 133:11-135:23) (not

mentioning anything about Officer Buck being dragged); Cross Decl., docket no. 21, Ex. 21

(Buck Stat. at 6) (testifying that he "had to run to keep up with the vehicle" at the moment

when Mr. McCartor's car was going the fastest that it had gone, implying that he was able to

keep up and was not being dragged); id. (Buck Stat. at 13) (describing his injuries from the

incident as including a small scratch on his forearm, an overextended elbow and a sore

ORDER   7–

ankle); id., Ex. 22 (Gagner Stat. at 6-7) (describing Officer Buck as "running so fast" and as using "a full, full speed . . . out and out, full run" to keep up but that he never saw Officer Buck "lose his footing or stumble or anything of that nature"); id., Ex. 13 (Fernandes Stat. at 6) (Officer Buck "was um walking to like keep up with the car").

Third, on the related issue of the police's justification for using deadly force, Plaintiffs emphasize that Officer Gagner used deadly force because Mr. McCartor's car swerved to the left towards the McDonald's, not because Officer Buck was being dragged. Id., Ex. 22 (Gagner Stat. at 7-8); Ragonesi Decl., docket no. 17, Ex. 1 at 39-40 (Gagner Test. 134:1-135:23).

Fourth, on the issue of the timing of the use of deadly force, Plaintiffs have provided evidence, including Officer Buck's own testimony, that Officer Buck had regained his footing and had gained control over Mr. McCartor's arm in the moments prior to the shooting.  Ragonesi Decl., docket no. 17, Ex. 1 at 25 (Buck Test. at 82:11-17); id. at 48 (Harrison Test. at 13:10-15); Cross Decl., docket no. 21, Ex. 21 (Buck Stat. at 6).  Plaintiffs offer an expert opinion that Officer Buck was not in danger at the moment the shots were fired; this opinion was based on the testimony that prior to the shots being fired, Officer Buck was not being dragged and that Officer Buck came out of the window with Mr. McCartor's hand.  Tucker Aff., docket no. 20, at ¶22.

Fifth, Plaintiffs have provided evidence that Mr. McCartor might have been braking prior to the shooting.  Cross Decl., docket no. 21, Ex. 23 (photo of Mr. McCartor's right foot on the brake, not the accelerator).  Plaintiffs offer an expert opinion that Officer Buck was not in danger at the moment the shots were fired if the vehicle was coming to a stop before Officer Gagner fired.  Tucker Aff., docket no. 20, ¶22.

Richard L. McCartor, Sr. and Linda McCartor-Ammons, as Administrators for the Estate of Mr. McCartor (the "Estate"), and Talisha Brockman, Mr. McCartor's minor child

("Ms. Brockman"),[2] bring this action against the City of Kent and Officers Eades, Buck, and Gagner.  In their Complaint, Plaintiffs allege federal law claims under 42 U.S.C. § 1983 ("Section 1983") and state law claims of wrongful death, loss of consortium, negligent and intentional infliction of emotional distress, and extreme and outrageous conduct.  See Notice of Removal, docket no. 1 (Compl. at 4, Counts IV, V and VI).  Before the Court is Defendants' Motion for Summary Judgment in which Defendants move for qualified immunity on all of the federal and state law claims alleged against them.

## DISCUSSION

### 1.    Summary Judgment Standard

Summary judgment is appropriate when the movant demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Once the moving party meets its initial responsibility, the burden shifts to the non-moving party to establish that a genuine issue as to any material fact exists.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The non-moving party must present significant probative evidence tending to support its claim or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  Evidence submitted by a party opposing summary judgment is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

---

[2] This Order collectively refers to the Estate and Ms. Brockman as the "Plaintiffs."

ORDER   9–

1          **2.      The Estate's Section 1983 Claims**

2          Plaintiffs allege in the Complaint that Defendants violated Mr. McCartor's

3   constitutional rights during the events of December 6, 2002, and bring this action partly

4   under 42 U.S.C. § 1983.  See Notice of Removal, docket no. 1 (Compl. at 4, Count V).

5   Defendants claim that they are entitled to qualified immunity for their actions.

6                    **a.      Qualified Immunity**

7          "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of

8   litigation.'"  Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472

9   U.S. 511, 526 (1985)).  As a result, the Supreme Court has emphasized the importance of

10   resolving immunity questions at the earliest possible stage in litigation.  Id. at 201.  The

11   threshold inquiry is whether, taking the facts in the light most favorable to Plaintiffs,

12   Defendants' conduct violated one of Mr. McCartor's constitutional rights.  Id. at 201.  If no

13   constitutional violation occurred, then no further inquiry is necessary and the suit should be

14   dismissed.  Id.  If a constitutional violation could be made out on a favorable view of

15   Plaintiffs' submissions, then the inquiry turns to whether the constitutional right was "clearly

16   established."  Id.

17                 **i.      What Constitutional Right Is at Issue?**

18          Plaintiffs claim that Officer Eades, Officer Gagner, and Officer Buck all used

19   excessive force against Mr. McCartor in violation of his right to be free of unreasonable

20   seizures under the Fourth Amendment, as applied to the states through the Fourteenth

21   Amendment.

22          Claims of excessive force are analyzed under the objective reasonableness standard of

23   the Fourth Amendment as enunciated in Graham v. Connor, 490 U.S. 386, 399 (1989), and

24   Tennessee v. Garner, 471 U.S. 1, 7 (1985).  Determining whether the force used was

25   reasonable requires a careful balancing of the nature and quality of the intrusion on the

26   individual's Fourth Amendment interests against the countervailing governmental interests at

ORDER   10–

1  stake. <u>Graham</u>, 490 U.S. at 396. "Our Fourth Amendment jurisprudence has long

2  recognized that the right to make an arrest or an investigatory stop necessarily carries with it

3  the right to use some degree of physical coercion or threat thereof to effect it." <u>Id.</u> (citations

4  omitted).

5       The test of reasonableness requires careful attention to the facts and circumstances of

6  each particular case, including: (1) the severity of the crime at issue; (2) whether the suspect

7  poses an immediate threat to the safety of the officers or others; and (3) whether the suspect

8  is actively resisting arrest or attempting to evade arrest by flight. <u>Id.</u> at 396. "The

9  'reasonableness' of a particular use of force must be judged from the perspective of a

10  reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id</u>. "The

11  calculus of reasonableness must embody allowance for the fact that police officers are often

12  forced to make split-second judgments – in circumstances that are tense, uncertain, and

13  rapidly evolving – about the amount of force that is necessary." <u>Id.</u> at 396-97. Briefly

14  stated, the constitutional question is "whether the totality of the circumstances justifie[s] a

15  particular sort of . . . seizure." <u>Garner</u>, 471 U.S. at 8-9.

16          **ii.    What Does It Mean for a Constitutional Right to Be "Clearly**

17                   **Established"?**

18       As noted above, even if a plaintiff has raised a genuine issue for trial as to the

19  constitutionality of a defendant's conduct, qualified immunity should be granted to that

20  defendant unless the defendant violated a "clearly established" constitutional right. A

21  constitutional right is "clearly established" if it is "clear to a reasonable officer that his

22  conduct was unlawful in the situation he confronted." <u>Saucier v. Katz</u>, 533 U.S. at 202.

23  "This step, in contrast to the first, is an inquiry into the reasonableness of the officer's belief

24  in the *legality* of his actions." <u>Wilkins v. City of Oakland</u>, 350 F.3d 949 (9th Cir. 2003)

25  (emphasis in original). In <u>Saucier v. Katz</u>, the U.S. Supreme Court states:

26

ORDER   11–

1
2
3
4
5

> The concern of the immunity inquiry is to acknowledge that reasonable
> mistakes can be made as to the legal constraints on particular police conduct.
> It is sometimes difficult for an officer to determine how the relevant legal
> doctrine, here excessive force, will apply to the factual situation the officer
> confronts.  An officer might correctly perceive all of the relevant facts but have
> a mistaken understanding as to whether a particular amount of force is legal in
> those circumstances.  If the officers' mistakes as to what the law requires is
> reasonable, however, the officer is entitled to the immunity defense.

6   533 U.S. at 205.

7   The "objective reasonableness" test for excessive force outlined in <u>Graham</u> "does not

8   always give a clear answer as to whether a particular application of force will be deemed

9   excessive by the courts."  <u>Id.</u>  Because there are "limitless factual circumstances," qualified

10   immunity operates "to protect officers from the sometimes 'hazy border between excessive

11   and acceptable force,' and to ensure that before they are subjected to suit, officers are on

12   notice their conduct is unlawful."  <u>Id.</u> at 205-06 (quoting <u>Priester v. Riviera Beach</u>, 208 F.3d

13   919, 926-27 (11th Cir. 2000)).  Thus, "even if [an officer's] actions did violate the Fourth

14   Amendment, a reasonable but mistaken belief that his conduct was lawful would result in the

15   grant of qualified immunity."  <u>Wilkins v. City of Oakland</u>, 350 F.3d at 955.  "Qualified

16   immunity thus 'provides ample protection to all but the plainly incompetent or those who

17   knowingly violate the law.'"  <u>Id.</u> (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

18   "Because the focus is on whether the officer had fair notice that her conduct was

19   unlawful, reasonableness is judged against the backdrop of the law at the time of the

20   conduct."  <u>Brosseau v. Haugen</u>, 125 S.Ct. 596, 599 (2004).  To determine whether a

21   particular right was clearly established at the time of the injury, the Court first looks to

22   binding precedent.  <u>See</u> <u>Boyd v. Benton County</u>, 374 F.3d 773, 781 (9th Cir. 2004).  In the

23   absence of binding precedent, the Court looks to whatever decisional law is available to

24
25
26

1   ascertain whether the law is clearly established for qualified immunity purposes, including

2   decisions of state courts, other circuits, and district courts.[3] Id. (citations omitted).

3                   **b.      Officer Eades' use of the PIT Maneuver**

4              Plaintiffs first argue that Officer Eades should be deemed ineligible for qualified

5   immunity because he violated Kent City policy by failing to get supervisory authorization

6   before performing a PIT maneuver.  Pls.' Response, docket no. 19, at 16-17.  However, the

7   Kent Police Department Policy on which Plaintiffs rely had been revised as of the date of

8   this incident.  See Cross Decl., docket no. 21, Ex. 1 (Kent Police Dept. Policy 21.2.2 revised

9   2/9/00); Supp. Ragonesi Decl., docket no. 24, Ex. 1 (Kent Police Dept. Policy 21.2.2 revised

10  10/10/02).  According to the policy in effect at the time of this incident on December 6,

11  2002, Kent Police Officers could perform PIT maneuvers at speeds of less than 40 miles per

12  hour at their own discretion.  Supp. Ragonesi Decl., docket no. 24, Ex. 1 (Kent Police Dept.

13  Policy 21.2.2 at 7).  Even if Officer Eades had violated departmental policy, police

14  department guidelines do not create a constitutional right or have any bearing on the

15  qualified immunity analysis.  See Davis v. Scherer, 468 U.S. 183, 193-94 (1984).

16            Plaintiffs next argue that Officer Eades' PIT maneuver was an unnecessary and

17  excessive use of deadly force and that this seizure of Mr. McCartor was not objectively

18  reasonable under the circumstances.  Defendants do not dispute that the use of the PIT

19  maneuver constituted a seizure for purposes of the Fourth Amendment.  Defendants argue

20  that under the circumstances of this case, the use of the PIT maneuver was objectively

21  reasonable and therefore not excessive.  The Court agrees with Defendants.

22

23

24            [3] Although a victim's constitutional rights may be clearly established in the absence of
    a case on all fours prohibiting the particular manifestation of unconstitutional conduct at issue
25  if an officer's conduct is so patently violative of the constitutional right that reasonable officials
    would know without guidance from the courts that the action was unconstitutional, see Boyd v.
26  Benton County, 374 F.3d at 781, Plaintiffs have not made this argument as to Defendants'
    conduct.

ORDER   13–

1    "Deadly force" is defined as force that "creates a substantial risk of causing death or

2    serious bodily injury." Smith v. City of Hemet, 394 F.3d 689, 706 (9th Cir. 2005).

3    Plaintiffs' expert, Melvin Tucker, opines that Officer Eades' use of the PIT maneuver

4    "constituted the use of deadly force." Tucker Aff., docket no. 20, at ¶18. Mr. Tucker's

5    opinion is based on his conclusion that there was a "likelihood of injury to Mr. McCartor"

6    because of the differences in the size and weight of the two vehicles. Id. Even if the Court

7    were to accept this evidence for the purpose of summary judgment (and reject Defendants'

8    challenges to Mr. Tucker's expert qualifications, see Defs.' Reply, docket no. 23, at 4), the

9    evidence fails to raise a genuine issue for trial. No reasonable jury could rely on this

10   evidence of "likelihood of injury" to conclude that the PIT maneuver "create[d] a substantial

11   risk of causing death or serious bodily injury." See Smith, 394 at 706. The Court concludes

12   that, as a matter of law, Officer Eades did not use deadly force on Mr. McCartor.

13       Plaintiffs have also failed to raise a genuine issue for trial that Officer Eades' use of

14   the PIT maneuver constituted an unreasonable use of non-deadly force. Officer Eades

15   confronted Mr. McCartor in a parking lot in which Plaintiffs admit that there were no

16   pedestrians. Officer Eades performed the PIT maneuver at a time when Plaintiffs admit Mr.

17   McCartor was traveling at a slow speed. Mr. McCartor had ignored Officer Eades' lights

18   and sirens, had ignored Officer Eades repeatedly honking his horn, and had refused to pull

19   over. Officer Eades had every reason to believe that Mr. McCartor would continue to refuse

20   to stop. Attempting a low-speed PIT maneuver in an attempt to prevent a pursuit was an

21   objectively reasonable use of force in response to Mr. McCartor's attempt to evade arrest.

22   See Graham, 490 U.S. at 396 (whether suspect is attempting to evade arrest is a factor to

23   consider in determining the reasonableness of the use of force).

24       Taking the facts in the light most favorable to Plaintiffs, no reasonable jury could find

25   that Officer Eades' PIT maneuver was an objectively unreasonable use of force. Because no

26   constitutional violation occurred, the Court does not address the issue of whether a

ORDER  14–

1   constitutional right was "clearly established" in order to grant Officer Eades qualified

2   immunity.  See Saucier v. Katz, 533 U.S. at 201.  The Court grants Officer Eades qualified

3   immunity and dismisses the Estate's Section 1983 claim against Officer Eades.

4                  **c.      Officer Gagner's Use of Deadly Force**

5           The Court must next determine if Plaintiffs have raised a genuine issue for trial as to

6   the constitutionality of Officer Gagner's use of deadly force, and, if so, whether the

7   constitutional right violated was clearly established at the time.  See Saucier v. Katz, 533

8   U.S. at 201.

9           As to the reasonableness of Officer Gagner's conduct, the key issue is whether Officer

10  Buck's safety was in jeopardy because the severity of the crimes (i.e., speeding and having a

11  suspended driver's license) clearly was minimal and because Mr. McCartor clearly was

12  evading arrest.  See Graham, 490 U.S. at 396.  The United States Supreme Court emphasizes

13  the safety consideration in deadly force cases in stating the following rule:

14

15          Where the officer has probable cause to believe that the suspect poses a threat
            of serious physical harm, either to the officer or to others, it is not
            constitutionally unreasonable to prevent escape by using deadly force.

16

17  Garner, 471 U.S. at 11.

18          There is a genuine issue for trial as to whether Mr. McCartor posed a threat of serious

19  physical harm to Officer Buck.  There are *material* factual disputes regarding the speed of

20  Mr. McCartor's car, Officer Buck's ability to keep up with the car, the timing of Officer

21  Buck's regaining of his footing and of putting Mr. McCartor into an arm hold as related to

22  the timing of Officer Gagner's firing of the lethal shots, and the possibility that Mr.

23  McCartor was bringing the vehicle to a stop prior to being shot.[4]  Moreover, the lack of

24  ────────────────

25          [4] Whether Officer Gagner was motivated to fire his rifle based on the car's swerving to
    the left or based on Officer Buck's being dragged is an immaterial factual dispute because the
26  Graham test is one of objective, not subjective, reasonableness.  See Graham, 490 U.S. at 397
    (an officer's underlying intent or motivation is irrelevant); Fed. R. Civ. P. 56(c) (requiring that
    an issue of fact be both "genuine" and "material").

1    warning as to the imminent use of deadly force and the fact that other officers were blocking

2    the exits are key undisputed facts that a reasonable jury could possibly rely upon in

3    determining that Officer Gagner's use of deadly force was unreasonable.  The Court

4    concludes that Plaintiffs have provided sufficient evidence from which a reasonable jury

5    could find that Officer Gagner's use of deadly force was objectively unreasonable and

6    therefore unconstitutional.

7        Given a possible constitutional violation, the next inquiry is whether Mr. McCartor's

8    constitutional right to be free of the use of deadly force under the circumstances was "clearly

9    established" at the time of the incident.  The short answer is "no."

10       Plaintiffs argue that Mr. McCartor's flight in the car is analogous to the burglar's

11   flight on foot in Garner, the United States Supreme Court case in which the Court held that it

12   is unlawful to use deadly force on an apparently unarmed suspected felon.  See Garner, 471

13   U.S. at 11.  In that case, a police officer shot and killed an unarmed 15-year-old boy who

14   was suspected of breaking into a home and who began to climb over a fence when the police

15   called out "police, halt" and took a few steps towards him.  Id. at. 3-4, n.2.  The case before

16   the Court, however, involves a suspect who was "armed" – with his vehicle.  Even Plaintiffs

17   admit, albeit in a different part of their case, that a car can be a deadly weapon.  See Pls.'

18   Response, docket no. 19, at 21; United States v. Sanchez, 914 F.2d 1355 (9th Cir. 1990).

19   Not only was Mr. McCartor armed, but also he demonstrated a repeated willingness to use

20   his car to thwart the police's efforts to arrest him and to endanger Officer Buck's safety.

21   These differences between the facts of the case before the Court and the Garner case

22   precludes the use of Garner as binding precedent to show that Mr. McCartor's right to be

23   free of Officer Gagner's use of deadly force was "clearly established" at the time of the

24   incident.

25       At oral argument, Plaintiffs argued that Officer Gagner should have been on notice

26   that his conduct was unlawful because of the Sixth Circuit case of Fisher v. City of

ORDER   16–

1  Memphis, 234 F.3d 312 (6th Cir. 2000). In that case, a police officer shot at a vehicle that

2  was driving towards him, injuring the passenger of the vehicle. See id. at 315. The Sixth

3  Circuit affirmed the District Court's judgment upholding a jury verdict finding the officer

4  liable for the passenger's injuries. See id. at 317. Although the jury must have found the

5  officer's shooting to be "objectively unreasonable" in order to find him liable, the case law

6  does not explain the jury's rationale (nor could it have explained it). See id. Without any

7  Fourth Amendment analysis, and because of the different fact patterns of the cases, Fisher

8  cannot be said to have "clearly established" the unreasonableness of Officer Gagner's use of

9  deadly force. See Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) (stating that

10  "preexisting law must give real notice of practical value to government officials . . . [p]ublic

11  officials are not obligated to be creative or imaginative in drawing analogies from previously

12  decided cases.").

13      Plaintiffs have failed to locate a single case, binding or otherwise, holding that it is

14  unlawful to use deadly force against a suspect who threatens the safety of others and who

15  refuses to yield to police officers despite the officers' repeated attempts to stop him through

16  the use of non-deadly force. In contrast, Defendants have highlighted several cases that

17  come to the opposite conclusion – namely, that it is objectively reasonable to use deadly

18  force in these situations. Because there is no binding precedent from the United States

19  Supreme Court or the Ninth Circuit,[5] the cases presented come from other circuits.

20      In Pace v. Capobianco, the police shot and killed a suspect who used his car in a

21  manner to give a reasonable policeman probable cause to believe that it had become a deadly

22  weapon, even though the car had come to a stop at the time of the shooting. See 283 F.3d at

23  _____

24      [5] Since the incident, the United States Supreme Court has held that it was not clearly established that an officer violated the Fourth Amendment when she shot a suspect as he fled in a vehicle, given the risk he posed in the immediate area. See Brosseau v. Haugen, 125 S.Ct.

25  596, 599-600 (2004); see also Blanford v. Sacramento County, 406 F.3d 1110, 1119 (9th Cir. 2005) (holding that the law was not clearly established prohibiting the use of deadly force

26  against a man brandishing a sword). This Court does not rely on these cases in its analysis because they did not make up the body of law at the time of the incident.

1282 (11th Cir. 2002).  Prior to being shot, the suspect in <u>Pace</u> led the police on a high-speed chase and failed to yield to the police despite the officers' use of pepper spray in his face, the use of blockades, and the use of commands to get out of his car.  <u>See</u> <u>id.</u> at 1277-78.  The Eleventh Circuit in <u>Pace</u> concluded that the Fourth Amendment did not rule out the use of deadly force.  <u>See</u> <u>id.</u> at 1282.  In the alternative, the <u>Pace</u> court held that the individual defendants were due immunity because the pre-existing law did not warn defendants fairly that shooting the decedent in these circumstances would clearly violate federal law.  <u>See</u> <u>id.</u> at 1282-83.

In <u>Dudley v. Eden</u>, the police shot and injured a suspected bank robber who refused to comply with commands of armed policemen to get out of his car and who then led police on a low-speed chase.  <u>See</u> 260 F.3d 722, 724, 727 (6th Cir. 2001).  The suspect recklessly drove into oncoming rush hour traffic even though police had managed to shoot out one of his tires.  <u>See</u> <u>id.</u>  The Sixth Circuit in <u>Dudley</u> concluded that no jury could find that the officer's use of force was unreasonable even though the suspect's car and the officer's car had slowed to a halt at the time of the shooting, after colliding.  <u>See</u> <u>id.</u>

In <u>Cole v. Bone</u>, the police shot and killed a driver who led police on a high-speed chase.  <u>See</u> 993 F.2d 1328 (8th Cir. 1993).  The police pursued the suspect across state lines and attempted to stop him by executing rolling and stationary roadblocks and by shooting out his tires, to no avail.  <u>See</u> <u>id.</u> at 1330-31.  The Eighth Circuit in <u>Cole</u> held that the officer's decision to use deadly force to disable the truck was not objectively unreasonable because he had probable cause to believe that the truck posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves.  <u>Id.</u> at 1333.

In <u>Smith v. Freland</u>, the police shot and killed a driver who led police on a high-speed chase.  <u>See</u> 954 F.2d 343 (6th Cir. 1992).  The police officer fired at him after he had been cornered on a dead-end residential street.  <u>See</u> <u>id.</u> at 344.  The Sixth Circuit in <u>Smith</u> held that no reasonable jury could find that the officer acted unreasonably in light of the fact that

ORDER   18–

1   the driver had escaped other roadblocks and had posed a major threat to the officers manning

2   the roadblock.  See id. at 347.

3          Even though the Court has held that taking the facts in the light most favorable to

4   Plaintiffs, a reasonable jury could possibly find Officer Gagner's use of deadly force to be

5   objectively unreasonable, there was no case law at the time of the incident that would have

6   put Officer Gagner on notice that his conduct was objectively unreasonable.  The Pace,

7   Dudley, Cole and Smith cases taken together by no means "clearly establish" that Officer

8   Gagner violated the Fourth Amendment.  Indeed, they tend to justify his use of deadly force

9   in the circumstances of the case.  Because the law did not clearly establish Mr. McCartor's

10  constitutional right to be free of Officer Gagner's use of deadly force, the Court grants

11  Officer Gagner qualified immunity and dismisses the Estate's Section 1983 claim against

12  Officer Gagner.

#### d.        Officer Buck's Attempt to Stop the Car

14         Plaintiffs contend that Officer Buck violated Mr. McCartor's Fourth Amendment right

15  to be free from unreasonable seizures when Officer Buck jumped into the driver's side

16  window, and then attempted to knock Mr. McCartor's car out of gear, turn off the car or put

17  Mr. McCartor in an arm hold.  Pls.' Response, docket no. 19, at 26.  Plaintiffs argue that

18  Officer Buck should be denied qualified immunity because he "recklessly provoked the

19  confrontation with Richard McCartor which subsequently led to his death."  Id. at 26-27

20  (citing Billington v. Smith, 292 3d 1177 (9th Cir. 2002), and Alexander v. City and County

21  of San Francisco, 29 F.3d 1355 (9th Cir. 1994)).  "[W]here an officer intentionally or

22  recklessly provokes a violent confrontation, if the provocation is an independent Fourth

23  Amendment violation, he may be held liable for his otherwise defensive use of deadly

24  force."  Billington v. Smith, 292 F.3d at 1189.  In Alexander v. City and County of San

25  Francisco, the Ninth Circuit denied qualified immunity to officers who reasonably fired in

26  self-defense, because their reckless and unconstitutional provocation (i.e., entering the man's

1    house to arrest him without an arrest warrant) created the need to use force.  See 29 F.3d at

2    1364-65.

3        The Court finds Plaintiffs' argument for denying Officer Buck qualified immunity

4    unpersuasive.  First, the <u>Billington</u> and <u>Alexander</u> cases speak only to situations where the

5    officer who provoked the violent confrontation was the same as the officer who used deadly

6    force.  Here, Officer Buck allegedly provoked the violent confrontation that lead to Officer

7    Gagner's use of deadly force.  Officer Buck does not need qualified immunity to be shielded

8    from liability for Officer Gagner's use of deadly force.  Second, no reasonable jury could

9    find that Officer Buck's attempt to stop Mr. McCartor's car was objectively unreasonable.

10   See <u>Graham</u>, 490 U.S. at 396.  Because Officer Buck's actions cannot be deemed to be an

11   independent Fourth Amendment violation, the Court grants Officer Buck qualified immunity

12   and dismisses the Estate's Section 1983 claim against Officer Buck.

13       **3.      Ms. Brockman's Section 1983 Claims**

14       Plaintiffs allege in the Complaint that Defendants violated Ms. Brockman's

15   constitutional rights during the events of December 6, 2002, and bring this action partly

16   under 42 U.S.C. § 1983.  See Notice of Removal, docket no. 1 (Compl. at 4, Count V).

17   Defendants now move for the dismissal of Ms. Brockman's federal law claims.  See Defs.'

18   Mot. Summ. J., docket no. 18, at 16-17; Defs.' Reply, docket no. 23, at 12.  Plaintiffs'

19   response brief fails to refute Defendants' arguments.  See <u>generally</u> Pls.' Response, docket

20   no. 19.  "When a motion for summary judgment is made and supported . . . an adverse party

21   may not rest upon the mere allegations or denials of the adverse party's pleading,

22   but . . . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R.

23   Civ. P. 56(e); <u>see</u> <u>also</u> Local Rule CR 7(b)(2) ("If a party fails to file papers in opposition to

24   a motion, such failure may be considered by the court as an admission that the motion has

25   merit.").  By failing to refute Defendants' arguments, Plaintiffs have failed to show that there

26   is a genuine issue for trial.  For this reason, and, in the alternative, because Defendants are

1  entitled to qualified immunity for the same reasons outlined above, the Court GRANTS

2  Defendants' Motion, docket no. 18, and DISMISSES with prejudice Ms. Brockman's federal

3  law claims against Defendants.

4      **4.**    **Plaintiffs' State Law Claims**

5      Plaintiffs allege in the Complaint state law claims of wrongful death, loss of

6  consortium, negligent and intentional infliction of emotional distress, and extreme and

7  outrageous conduct. <u>See</u> Notice of Removal, docket no. 1 (Compl. at 4, Counts IV and VI).

8  Defendants move for the dismissal of these state law claims based on qualified immunity

9  under state law. <u>See</u> Defs.' Mot. Summ. J., docket no. 18, at 18-20.  Plaintiffs' response

10  brief fails to refute Defendants' arguments. <u>See</u> Pls.' Response, docket no. 19, at 12:22-25

11  (merely stating that "the state law claims for wrongful death are analyzed under the same

12  standard as a Fourth Amendment analysis").  By failing to refute Defendants' arguments,

13  Plaintiffs have failed to show that there is a genuine issue for trial.  <u>See</u> Fed. R. Civ. P. 56(e);

14  Local Rule CR 7(b)(2).  At oral argument, Plaintiffs conceded that Defendants should be

15  granted qualified immunity under state law if the Court held that there was qualified

16  immunity under federal law.  Because Plaintiffs failed to refute Defendants' arguments and,

17  in the alternative, because Defendants are entitled to qualified immunity for the same reasons

18  outlined above, the Court GRANTS Defendants' Motion, docket no. 18, and DISMISSES

19  with prejudice Plaintiffs' state law claims against Defendants.

20  <u>C</u>ONCLUSION

21      The Court GRANTS Defendants' Motion for Summary Judgment Dismissal of Eades,

22  Buck and Gagner Based on Qualified Immunity, docket no. 18, and DISMISSES with

23  prejudice all federal and state law claims against defendants Eades, Buck and Gagner.  The

24  only defendant remaining in this lawsuit is the City of Kent.

25

26

1    IT IS SO ORDERED.

2    Filed and entered this 12th day of October, 2005.

3

4    _____
     Thomas S. Zilly
5    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   22–